## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| VICKIE K. PREWETT, et al., | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| v. | } | **Case No. 2:00-CV-1674-RDP-SRW** |
| | } | |
| STATE OF ALABAMA | } | |
| DEPARTMENT OF | } | |
| VETERANS AFFAIRS, et al., | } | |
| | } | |
| **Defendants.** | } | |

### MEMORANDUM OPINION

After reassignment of this Equal Pay Act ("EPA") and Title VII case to the undersigned from The Honorable Mark E. Fuller, and having received requests from the parties to revisit certain issues previously decided in this case, the court permitted each side to request reconsideration of two prior rulings. As a result of those efforts,[1] the following motions are before the court, which have been fully briefed and were argued at a hearing held earlier this year: (1) Plaintiffs' Second Motion for Reconsideration (Doc #184); (2) Defendant Alabama Department of Veterans Affairs' ("Alabama VA") Motion for Reconsideration (Doc #186); (3) Defendant Alabama State Personnel Department's ("SPD") Motion for Reconsideration (Doc #185); and (4) Defendants' Motion to Amend/Correct Order on Motion to Alter Judgment (Doc #192).[2]

---

[1] In conjunction with those motions, the court also granted several requests from the parties for additional discovery related to the matters before the court on reconsideration.

[2] The court also has before it the parties' dueling motions to strike the chart summaries of each Plaintiff's Equal Pay Act *prima facie* case that were submitted in response to the court's February 7, 2007 order (Docs. # 223, 228), and Defendant SPD's belated motion to strike portions of the "unsworn declarations" that Plaintiffs submitted as part of their January 2002 opposition to Defendants' motion for summary judgment (Doc. # 225). Having considered the parties' arguments on these motions, the court finds that all of the motions to strike are due to be denied. (Docs. # 223,

All four of the motions request reconsideration of issues that were previously decided by Chief Judge Fuller in his March 3, 2006 Memorandum Opinion on Defendants' Rule 56 motion (Docs. # 119, 120-2)("Judge Fuller's Summary Judgment Opinion")[3] and subsequent modification thereof (Doc. # 155).   In his Summary Judgment Opinion, Judge Fuller rejected the bulk of Defendants' arguments and therefore, with only a few exceptions,[4] he denied summary judgment on Plaintiffs' EPA and Title VII claims.  (Docs. # 119, 120-2).  Collectively,[5] two of Defendants' motions to reconsider challenge virtually each step of Judge Fuller's analysis denying summary judgment.  (Docs. # 185, 186).  As to the limited claims on which Judge Fuller granted summary judgment for Defendants, the parties seek reconsideration of only the dismissal of the EPA claims of Plaintiffs Vicky Brown and Christine Hale and the subsequent, partial reinstatement of those claims.[6]  (Docs. #184, 192).  Nevertheless, the court does not reach the merits of the motions to

---

225, 228).  Additionally, all pending requests to exclude evidence at trial - filed many moons before the undersigned received this case by reassignment - are mooted by the court's rulings herein. (*See* Docs. # 146, 153, 168, 169, 170, 171, 172, 173).

[3] The opinion can also be found at *Prewett v. State of Alabama Dept. of Veterans Affairs*, 419 F. Supp. 2d 1338, 1343-49 (M.D. Ala. March 3, 2006).  For the sake of convenience, the court will cite herein to the published opinion.

[4] Judge Fuller granted summary judgment with respect to: (1) the EPA claims of Plaintiffs Vicky Brown and Christine Hale; (2) the Title VII claims of Plaintiffs Susan Collier, Sue Judkins, and Theresa Thomason; and (3) Plaintiff Collier's constructive discharge claim.  *Prewett*, 419 F. Supp. 2d at 1365.

[5] Although each reconsideration motion was filed by a separate Defendant, for the purposes of this opinion the court will address these motions as if they were filed by both Defendants given that the court permitted *each side* - not each party - to challenge two prior rulings.

[6] Judge Fuller originally determined that Plaintiffs Brown and Hale "have failed to show that their work is substantially similar to the VSOs . . . to establish a *prima facie* EPA violation" because they "admitted that the VSOs [in their particular offices] are their supervisors . . . . [who] inherently have more responsibility than their subordinates." *Prewett*, 419 F. Supp. 2d at 1356.  However, he

reconsider that are focused on the limited issues regarding Brown and Hale's claims, because it finds that Defendants are due judgment as a matter of law on all of Plaintiffs' claims for the reasons outlined below.

This opinion has been a long time coming. Suffice it to say that the undersigned has struggled immeasurably - both in time and depth - with the issues presented by the parties' motions to reconsider. Aside from the unique and difficult legal questions presented by the facts of this case, the sheer magnitude of wading through seven years of voluminous litigation was daunting, especially considering that the undersigned only recently was invited to the party. By far, however, the most difficult challenge was that the parties' motions seek vacatur of a very thorough opinion authored by a distinguished judge of this court.

In its analysis on reconsideration, this court has assumed that the facts of the case have not changed from the date that Judge Fuller entered his Summary Judgment Opinion.[7]  Indeed, this opinion relies entirely on, and assumes familiarity with, the detailed and thorough recitation of the facts set out by Judge Fuller (and incorporated by reference herein).  *Prewett*, 419 F. Supp. 2d at1343-49.  Likewise, the parties' arguments are not new.  They are the same arguments presented in the Rule 56 materials that were filed initially in 2001 and repackaged for the undersigned in 2007.

_____

later reinstated Brown and Hale's EPA claims "as to those time periods during which there was no VSO in the office in which they were serving" (Doc. # 155), when Plaintiffs "brought to the Court's attention that both Brown and Hale served for periods of time without VSOs in their offices." (Doc. # 134).

[7] Although the parties have conducted additional discovery since the issuance of that opinion, any additional evidence proffered by the parties fails to materially alter Judge Fuller's summary of the facts, viewed in the light most favorable to Plaintiffs.

What *has changed,* and what sets the stage for this court's complete one hundred and eighty-degree turn on the Rule 56 arguments, is that in their most recent motions, the parties have finally focused their attention on the unique legal issues at play in this case. Given the limitation on the number of matters that this court was willing to reconsider - each side was allotted only two bites at the apple - the parties were forced to hone their arguments. It is through this refocused lens that the undersigned views the applicable law. And it is for the reasons outlined below that the undersigned concludes that Defendants are entitled to judgment as a matter of law on all of Plaintiffs' claims.

## I.    Applicable Standards of Review

The pending motions to reconsider, permitted by the undersigned at the parties' request in light of the reassignment of this case, have asked this court to take a second look at the issues decided by Judge Fuller's Summary Judgment Opinion. Those requests, therefore, invoke again the well-worn Rule 56 standard of review. Summary judgment is only appropriate if there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). It is the moving party's initial burden to identify evidence which could indicate an absence of disputed fact issues. *Id.* at 323. Once the non-moving party presents evidence to show that there are genuine issues for trial, the court must believe this evidence and draw all inferences in favor of the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). The existence of any material factual dispute on an issue affecting the outcome of the case can defeat summary judgment. *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).

## II.      Discussion

The court begins with an analysis of the EPA claims, as the resolution of those claims is dispositive of the Title VII claims as well.

### A.      Equal Pay Act

The EPA prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work, 29 U.S.C. § 206(d)(1), and it "prescribes a form of strict liability: Once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a 'factor other than sex' is responsible for the differential. If the defendant fails, the plaintiff wins. The plaintiff is not required to prove discriminatory intent on the part of the defendant." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992) (citing *Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539 (11th Cir.1991)).[8] When Congress enacted the EPA, its purpose was:

> to remedy what was perceived to be a serious and endemic problem of employment discrimination in private industry-the fact that the wage structure in many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same.

*Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (citations omitted). Although there is no question in this Circuit that the EPA governs the compensation of not only the private employers who were targeted by the statute initially but also state employers in the public sector, *see Hundertmark v. State of Florida Dept. of Transp.*, 205 F.3d 1272, 1276 (11th Cir. 2000), neither the

---

[8] Nevertheless, even absent a requirement of proof of discriminatory intent, "[t]he EPA's broad defense for employers ensures that the Act targets only intentional purposeful discrimination." *Adams v. Florida Power Corp.*, 255 F.3d 1322, 1329 (11th Cir. 2001)(Barkett, J., specially concurring).

statute, the interpretive regulations, nor the applicable case law provides much guidance as to how the EPA can, and should, be applied in the context of public employment when the jobs at issue are governed by state statute.

### 1.    The *Prima Facie* Case

A female employee[9] demonstrates a *prima facie* case of an Equal Pay Act violation by showing that her employer paid male employees different wages for equal work for jobs which require "'equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir.1995) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) and 29 U.S.C. § 206(d)(1)).   Although formal job titles or descriptions may be considered, the controlling factor in the court's assessment of whether two jobs are substantially equal must be actual job content.   *Miranda*, 975 F.2d at 1533; *Arrington v. Cobb Cty.*, 139 F.3d 865, 876 (11th Cir. 1998) ("[A]lthough formal job titles or descriptions may be considered, the controlling factor in the court's assessment of whether two jobs are substantially equal must be actual job content."); *Hodgson v. Brookhaven Gen'l Hosp.*, 436 F.2d 719, 724 (5th Cir. 1970) ("Job descriptions prepared by the employer may or may not fairly describe job content.").[10] Thus, "[t]he *prima facie* case . . . focuses solely on the *primary duties* of each job, not duties that are incidental or insubstantial."   *Miranda*, 975 F.2d at 1533 (emphasis added).

A plaintiff need only demonstrate that the jobs at issue are *substantially* similar, not identical. *Miranda*, 975 F.2d at 1533.   Nonetheless, "[t]he standard for determining whether jobs are equal in

---

[9] All of the Plaintiffs in this case are female.

[10] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

terms of skill, effort, and responsibility is high." *Waters v. Turner, Wood, & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir.1989).  Indeed, Plaintiffs' EPA burden of proving that their positions are equivalent to the positions of their comparators is a more difficult burden than the comparison which must be made to support their Title VII claims.  *Miranda*, 975 F.2d at 1526.[11]

As noted earlier, the unique facts of this public employer case do not easily fit into the EPA mold.  Most of this Circuit's case law interpreting the EPA was developed in the context of private employers and is therefore not tailored to the unique posture of governmental employees.  The case law does not contemplate a comparator position that was created by statute, especially where - as in this case - that statutory scheme also dictates the qualifications for, and the responsibilities of, the position itself.  Although the Eleventh Circuit has pronounced that formal job titles or descriptions are not to be equated with job content, statutory provisions are far more influential than a job description that exists only on paper and is subject to change on a whim.  Indeed, as the court's analysis demonstrates below, the statutes governing the positions in this case are inextricably intertwined with the content of those jobs.

Thus, the challenge for this court has been to give the appropriate deference to Alabama's statutory scheme while remaining true to this Circuit's interpretation of EPA analysis.  Against that backdrop, the court has given careful consideration to each prong of the tripartite test of skill, effort,

---

[11] The former Fifth Circuit noted that when Congress drafted the EPA, it substituted "equal" for "comparable" to indicate that "the jobs involved must be virtually identical, that is, they would be very much alike or closely related to each other."  *Brennan v. City Stores, Inc.*, 479 F.2d 235, 238 (5th Cir.1973).  More recently, the Eleventh Circuit echoed that observation:  "Congress manifested its intent to narrow the applicability of the Act . . . . [and] intended to permit employers wide discretion in evaluating work for pay purposes.  Thus, although employees do not have to prove jobs are identical, they have the heavy burden of proving 'substantial identity of job functions.'"  *Waters*, 874 F.2d at 799.

and responsibility which "constitute separate tests, *each of which must be met* in order for the equal

pay standard to apply." 29 C.F.R. § 1620.14 (1986) (emphasis added).[12]

### a.   Equal Effort

"Effort is concerned with the measurement of the physical or mental exertion needed for

performance of a job. Job factors which cause mental fatigue and stress, as well as those which

alleviate fatigue, are to be considered." 29 C.F.R. § 1620.16(a) (1986).  As noted earlier, the court's

analysis must focus not on the incidental or insubstantial duties of a job, but on the "primary duties"–

a term of art that is sprinkled throughout the EPA jurisprudence of this Circuit[13] but not as of yet

clearly defined.  It is apparent from the case law that "primary" most certainly refers to the

significance of a duty when viewed as a component of overall job content - primary duties cannot

be incidental, nonessential, or unimportant. *See, e.g., Miranda*, 975 F.2d at 1533.

Less clear in the "primary" analysis, however, is what importance should be placed on the

*amount of time* devoted to a duty.  Although the effort required of two jobs *may* be deemed unequal

---

[12]  The court is aware that Plaintiffs must also establish "similar working conditions," which has been interpreted to relate only to surroundings or hazards of the job.  29 C.F.R. § 1620.18; *Corning Glass Works*, 417 U.S. at 201-02.  Because that aspect of the *prima facie* case is not in dispute, the court does not analyze it here.

[13]  In fact, the most recent EPA opinion issued by the Eleventh Circuit (which was not selected for publication) emphasizes that a court must first determine if a duty is "primary" before that duty can be considered in the substantially similar analysis:

> Moreover, the parties raise genuine issues of fact as to whether field maintenance and generation of revenue were primary duties of the baseball coach. Such a distinction is material because, to the extent that they were not primary duties, it was improper for the district court to consider them in determining whether the two coaching positions were substantially similar.

*Hankinson v. Thomas County School System,* 2007 WL 4226389, *2 (11th Cir. December 3, 2007).

if one job demands the performance of an additional duty that takes up a substantial amount of time,[14] the case law suggests that time alone is not the determinative factor of what duties are "primary" to job content.  As the former Fifth Circuit observed, "a wage differential can be justified for employees who are available to perform an important differentiating task even though they do not spend large amounts of time at the task." *Marshall v. Dallas Independent School District*, 605 F.2d 191, 195 (5th Cir.1979); *Hodgson v. Golden Isles Convalescent Homes, Inc.*, 468 F.2d 1256, 1258 (5th Cir.1972); *see also Mulhall v. Advance Sec., Inc.,* 19 F.3d 586, 593 (11th Cir. 1994)(finding that even in the absence of evidence "of the time actually spent" in the investigative function of the purported comparator's job, the skills related to that function are "more than an incidental part"of his job as a whole, rendering the jobs incomparable); *Beall v. Curtis***,** 603 F.Supp. 1563 (M.D.Ga.), *aff'd without op.*, 778 F.2d 791 (11th Cir.1985) (applying the "important differentiating factor" analysis to the "equal skill" prong of the *prima facie* case).  In reaching the conclusion that the amount of time devoted to a duty may not signify its importance to overall job content, the former Fifth Circuit relied on the legislative history of the statute:

> It is not merely comparable skill and responsibility that Congress sought to address, but a substantial identity of job functions . . . . Congress intended to permit employers wide discretion in evaluating work for pay purposes. In the House Subcommittee Report on the Equal Pay Act, 109 Cong.Rec. 9209-9210 (1963), examples were debated to illustrate that a wage differential can be justified for employees who are available to perform an important differentiating task even though they do not spend large amounts of time at the task. Again, this approach requires examination of equal work claims in the light of practice in the particular employment.

_____

[14] *See Brookhaven Gen'l Hospital,* 436 F.2d at 725 ("[J]obs do not entail equal effort, even though they entail most of the same routine duties, if the more highly paid job involves additional tasks which (1) require extra effort, (2) consume a significant amount of the time of all those whose pay differentials are to be justified in terms of them, and (3) are of an economic value commensurate with the pay differential.").

*Hodgson*, 468 F.2d at 1258.   The interpretive regulations echo that sentiment.  *See* 29 C.F.R. § 1620.14 ("[T]he amounts of time which employees spend in the performance of different duties are not the sole criteria. It is also necessary to consider the degree of difference in terms of skill, effort, and responsibility. These factors are related in such a manner that a general standard to determine equality of jobs cannot be set up solely on the basis of a percentage of time.").

In this case, it appears from the undisputed facts that the majority of time expended by both the female Plaintiffs, who are all "County Veterans' Affairs Assistants" ("CVAAs"),[15] and their male comparator Veteran Service Officers ("VSOs")[16] is devoted to the delivery of counseling and other Alabama VA services to United States' Armed Services veterans who reside in Alabama.  The parties are in agreement that with few exceptions, when a veteran enters a county VA office, that veteran's case is randomly assigned to either the CVAA or VSO who is stationed there.  Thus, the facts suggest that CVAAs and VSOs typically provide identical, or at least substantially similar, services to the veterans who seek assistance from the Alabama VA at a county office.

The crux of the dispute, then, is whether the VSOs perform additional duties outside of the office environment that differentiates the content of their positions from that of the CVAAs.  The Alabama Legislature has certainly mandated that *should* be the case as a VSO is statutorily obligated to "devote his entire time" to an enumerated list of tasks that do not apply to CVAAs.  *See* Ala. Code

_____

[15] According to Defendants, the "CVAA" moniker has now been replaced with the "official merit system title of ASA" or "Administrative Support Assistant."  (Doc. # 186, at 2 n.1).  For the sake of continuity, however, the court will refer to Plaintiffs as "CVAAs," which is the term used throughout Judge Fuller's Summary Judgment Opinion.

[16] The VSO position is open to males and females, but the vast majority of VSOs are male. Plaintiffs are only comparing themselves to the male VSOs.

§ 31-5-10.[17] Nonetheless, the court is cognizant of the fact that when considering whether the VSOs and CVAAs expend "equal effort" in the performance of their jobs, it must go beyond the duties

---

[17] The statute provides, in pertinent part:

(b) It shall be the duty of the county service commissioner [VSO] and district service commissioner [District VSO] to:

(1) Cooperate with and assist the volunteer county veterans' service committees in his district or county in the development of a veterans' assistance program for his district or county.

(2) Furnish information and data to the office of the [Director of the VA] relative to the various aspects of the problems of veterans and dependents of veterans in his jurisdiction.

(3) Provide in his office an information and referral service to veterans seeking aid and assistance in connection with matters pertaining to employment and reemployment, educational and vocational training, health, medical, rehabilitation and housing services and facilities, emergency financial assistance and other matters of similar or relative and appropriate natures.

(4) Cooperate with all national, state and local governmental and private agencies offering services or any benefits to veterans, their families and dependents.

(5) Aid all residents of the district or county who served in the military or naval forces or other armed services during any war in which the United States has been engaged, and members of the armed services during peacetime who have been discharged under conditions other than dishonorable from the services, their relatives, beneficiaries and dependents to receive from the United States any and all compensation, hospitalization, insurance and other aid or benefits to which they may be entitled under existing laws of the United States, or such as may hereafter be enacted, and he shall perform such other duties in connection therewith as may be assigned by the state board.

(6) To seek out and advise the veterans of the district or county of their rights and benefits under state and federal laws, and to encourage their taking advantage of the educational opportunity, trade and vocational training, and to counsel and advise widows, orphans and beneficiaries to the end that veterans and citizens of the county shall secure the maximum return from the available benefits.

Ala. Code § 31-5-10 (b).

established by the Alabama Code and focus instead on what duties the VSOs actually perform. In other words, when it comes to "equal effort," the duties listed in the Alabama Code may or may not be carried out by a VSO in daily practice.[18]

Nevertheless, even when the lens is focused not on what the statute says a VSO must do, but on what the VSOs actually do, Plaintiffs simply cannot overcome the fact that VSOs perform or are "available to perform" important differentiating tasks that CVAAs cannot. *Marshall*, 605 F.2d at 195. As Defendants put it, a VSO is eligible to perform duties "beyond that veterans-only door" that Plaintiffs could never perform as non-veterans. (Doc. # 186, at 2). It is undisputed that VSOs can become "accredited representatives" to argue cases before the Board of Veterans' Appeals while CVAAs cannot. It is undisputed that VSOs can belong to, and attend meetings of, various veterans' organizations like the American Legion whose membership is closed to non-veterans like CVAAs.[19] Thus, only a VSO is available to perform those tasks on behalf of the Alabama VA, which are undoubtedly important to the position because they fulfill the goals set for a VSO by the Alabama Legislature: (1) to "aid all [veterans] . . . to receive from the United States any and all compensation, hospitalization, insurance and other aid or benefits to which they may be entitled" (which may be

_____

[18] Thus, as Plaintiffs point out, it is certainly relevant that various Alabama VA employees (management and otherwise) believe that Plaintiffs and their comparators expend equal effort on their daily tasks. Nonetheless, it is important to assign the appropriate weight to that evidence. Although relevant, those comments by Defendants are not a *de facto* admission of EPA liability. That some employees have opined that the effort expended by VSOs and CVAAs is equal does not make their jobs equal under the tripartite test. Thus, while relevant, that evidence *alone* is not sufficient to satisfy Plaintiffs' heavy burden of substantial similarity, *Waters*, 874 F.2d at 799, especially given the interplay of statutory provisions that bear upon the *prima facie* case here.

[19] Although some of the Plaintiffs testified that they have assisted with functions or events sponsored by some of those organizations, it is undisputed that non-veterans like Plaintiffs cannot be members of those groups.

accomplished by arguing cases before the Board); and (2) "to seek out and advise the veterans of the district or county of their rights and benefits under state and federal laws" (which may be accomplished by membership in veterans-only organizations). *See* Ala. Code Ala. Code § 31-5-10 (b)(5), (6).

Although Plaintiffs have focused their arguments on the lack of significant *time* spent on those two tasks, the law makes clear that time is not the only consideration for ferreting out whether those functions are properly termed "primary duties." Indeed, even in the absence of evidence "of the time actually spent" in a particular job function, it can still constitute "more than an incidental part" of job content. *Mulhall*, 19 F.3d at 593. Accordingly, the court concludes that regardless of the amount of time each VSO spends arguing veterans cases before the Board or attending the meetings of veterans-only organizations, the *availability* of a VSO to perform those important differentiating tasks, that a CVAA undisputedly cannot perform, is sufficient to distinguish the primary duties of the VSO and CVAA positions.[20]

Accordingly, the court concludes that Plaintiffs have not established the "equal effort" prong of their *prima facie* case. Because each prong of the tripartite test must be established to fulfill the *prima facie* burden, for this reason alone Defendants are entitled to judgment as a matter of law on Plaintiffs' EPA claims. Nevertheless, because this case presents such a unique fact pattern, the court will continue with its analysis of the other *prima facie* requirements in the alternative.

---

[20] To borrow Defendants' analogy, VSOs, like attorneys, possess a key credential that permits special access that CVAAs, like paralegals, would be denied - even if that access may be infrequently used. (Doc. # 186, at 10-11 (citing *Beall*, 603 F. Supp. at 1578-80)).

### b. Equal Skill

The former Fifth Circuit, drawing upon the regulations published by the Secretary of Labor, found that "[s]kill includes consideration of such factors as experience, training, education, and ability." *Pearce v. Wichita County*, 590 F.2d 128, 133 (5th Cir.1979) (citing 29 C.F.R. § 800.125 (1977)).[21]   Nonetheless, "[p]ossession of a skill not needed to meet the requirements of the job cannot be considered." 29 C.F.R. § 1620.15 (1986).  Indeed, "at this stage *the jobs* and not the employees are compared, [and thus] only the skills and qualifications actually needed to perform the jobs are considered." *Miranda*, 975 F.2d at 1533 (emphasis added).

In the analysis of "equal skill," this court sees an important distinction between (on the one hand) *standard* experience, training, or education required for a position and possessed by all individuals in that position, and (on the other hand) any *additional or unique* experience, training, or education not required for a position but that an individual may bring to the table.  The Eleventh Circuit has made clear that consideration of the latter category of skills - those unique qualifications possessed by a particular employee holding a job - is proper only at the affirmative defense stage to "operate as a defense to liability rather than as part of a plaintiff's *prima facie* case under the Act." *Miranda*, 975 F.2d at 1533 n.18; *see also Mulhall,* 19 F.3d at 594 n.18 (finding that "individual employee qualifications are relevant only to defendant's affirmative defenses"). Therefore, if a particular individual's experience, training, or education is not relevant to the *prima facie* case, it logically follows that the only experience, training, or education that could be relevant to the *prima facie* case is that which may be properly characterized as a job requirement, prerequisite, or

---

[21] The court noted that, although those regulations are not binding, they should be given great weight. *Pearce*, 590 F.2d at 133 n. 7.  The more recent replication of the regulations cited by the court in *Pearce* can be found at 29 C.F.R. § 1620.15(a) (1986).

qualification applied to any person in that position. Such a distinction is consistent with the Eleventh Circuit's *prima facie* focus on a comparison of the *jobs* and not the individuals who hold those jobs.[22]

Here, the statutory requirement that all VSOs be honorably discharged wartime veterans has been mandated by the Alabama Legislature as a threshold qualification for the position since at least 1945.   Ala. Code § 31-5-9; *See* Acts 1945, No. 173, p. 304, § 6.   Whether characterized as "education," "experience," "training," or "ability," being a veteran is not solely a matter of status, it is a skill undisputedly required of *all* VSOs regardless of gender.   None of the CVAAs are required to be veterans and, in fact, none of them are.   Indeed, veteran status is *the* skill that makes an individual eligible to be hired into the statutory position of VSO and the very reason why a VSO serves at the pleasure of the Alabama VA State Service Commissioner (more commonly known as

_____

[22] Indeed, in the absence of such a distinction, the former Fifth Circuit's inclusion of "education, training, and experience" as components of the "equal skill" analysis would be meaningless as those characteristics would not be relevant until after the *prima facie* analysis is complete.   The court is aware that the Eleventh Circuit has not made this distinction in so many words.   Nonetheless, in analyzing the "equal skill" requirement, recent case law in this Circuit has left open the possibility that  an employer-mandated "job requirement" of education, training, or experience may be used to differentiate two positions in the EPA *prima facie* analysis.   In *Mulhall*, although the court found it irrelevant to the *prima facie* equal skill analysis that the comparator had an accounting degree and the plaintiff did not, the court made clear that "Defendants deny that an accounting degree is a job requirement." *Mulhall*, 19 F.3d at 594.   In *Miranda*, although the court found that the comparator's prior experience as a manager was irrelevant, there was no evidence that managerial experience was a prerequisite for the buyer position that plaintiff and her comparator both held. *Miranda*, 975 F.2d at 1533.   Neither of those cases forecloses the conclusion that a skill required of all individuals who hold a position may distinguish two positions in the EPA *prima facie* analysis.   At least one other district court in this Circuit has concluded that a skill such as education may be considered as part of the EPA *prima facie* case in the context of college professors where "degrees and education are intrinsic to the qualifications of university professors." *Schultz v. Board of Trustees of University of West Florida,* 2007 WL 2066183, *19 (N.D.Fla. 2007) (finding that Plaintiff and her comparators held different degrees and thus did not possess "equal skill" and distinguishing *Mulhall* because the accounting degree found to be irrelevant in *Mulhall* was not required for the position).

15

the Director of VA) to whom the VSO is "administratively responsible."  Ala. Code §§ 31-5-9, 31-5-10.  It is that skill which indelibly distinguishes the VSO position from the CVAA position.

It is also evident from the statutory scheme that veteran status is a skill *necessary* for the VSO position.  Plaintiffs have repeatedly stated that they do not challenge the constitutionality of the statutory requirements for the VSO position.[23]   In the absence of a constitutional challenge, this court is not postured to question the validity of the veteran status requirement for the VSO position because to do so would substitute the court's judgment for that of the legislature.  Thus, because the Alabama Legislature has said that veteran status is necessary for the position of VSO, it is.[24]

Nonetheless, the statute makes clear that the requirement that all VSOs have wartime service experience serves a necessary purpose.  It provides the Director of VA with a battalion of *actual veterans* that he can dispatch to those counties where he sees a need for an actual veteran to serve as a representative of his Department.  *See* Ala. Code §§ 31-5-9, 31-5-10.  The statute gives the Commissioner discretion to "study the requirements of each separate county, and to decide from time to time whether or not there is a need for a [VSO] in any particular county . . . . tak[ing] into

_____

[23] See, e.g., Doc. # 177, p. 3 ("[P]laintiffs do not challenge the wartime veteran status requirement for VSOs.").

[24] The court recognizes that it has afforded the statutes greater weight when analyzing the "equal skill" factor than it did in the earlier "equal effort" analysis where it noted that the statutory duties of a VSO may or may not be applied in practice.  This seemingly inconsistent outcome was intentional.  When it comes to skill and responsibility, the legislature has clearly pronounced which skills it deems necessary for the performance of the VSO position and what level of accountability or responsibility is required of the VSOs.  These provisions are not hypothetical - they *are* the job content when it comes to the skill and level of accountability required of a VSO.  On the other hand, when it comes to the analysis of "equal effort," the court recognizes that the Alabama Legislature's listing of duties for a VSO may or may not translate into the actual effort that a VSO expends in the performance of his job.   Thus, the court has weighted the varying impact of the statutory scheme accordingly at each point in the *prima facie* analysis.

consideration the total population of the county, the number of men inducted into the armed services from the county, the number of veterans of all wars present in the county and special circumstances and facts involving the concentration of industries or other problems which may have a tendency to increase or decrease the number of veterans in certain localities." Ala. Code § 31-5-9. Although there is no dispute that the CVAAs also perform a valuable service on behalf of the Alabama VA to the veterans in their respective counties, none of the CVAAs are - or could be - *the* veteran representative in those counties where the [Director of VA] sees a need for such a representative "who served in the military or naval forces or other armed services." Ala. Code § 31-5-10.

Against that broad statutory grant of authority to the Commissioner to establish a *veteran* presence on his behalf in each county, Plaintiffs' focus on the day-to-day random assignment of cases to the CVAA or VSO in each county office - as "evidence" that veteran status is irrelevant to the performance of the VSO position - is quite myopic. As outlined above, the statutory scheme makes clear that the establishment of the VSO position was intended for a much broader purpose than simply processing veterans' claims. Although evidence that some CVAAs and VSOs perform many of the same daily duties certainly is relevant to the *equal effort* prong of the *prima facie* EPA case, to find that wartime veteran status is not a *skill* needed to perform the VSO position when, in fact, the Alabama Legislature has clearly pronounced that to be the case, would require this court to act impermissibly as a "superlegislature." At this stage, the court's analysis focuses on whether the jobs require equal skill and thus can be properly compared for pay purposes. It would literally take

17

an Act of Congress (or, in this case, the Alabama Legislature) to equalize the skills of the VSO position and the skills of the CVAA position.[25]

At the very least, the importance placed on wartime veteran status by the Alabama Legislature renders that skill "more than an incidental part" of the VSO position. As the Eleventh Circuit noted in *Mulhall* (with application to the facts of this case in bold, brackets and the original text in italics):

> "We cannot so easily dismiss the **[veteran representative]** *investigative component* of **[the VSO]** *Hill's* job. While there is no evidence before us of the time actually spent in this particular job function, **[wartime veteran status]** *investigative skills* no doubt play**[s]** some role in one's ability to **[serve as the representative of the VA in each county]** *direct investigations*, making **[wartime veteran status]** *investigative knowledge* more than an incidental part of **[the VSO]** *Hill's* position. Plaintiff does not assert that she possessed **[the status of wartime veteran]** *any investigative skills*. Accordingly, we agree with the district court that under the strict similarity requirement imposed in EPA cases, the plaintiff failed to establish a prima facie case as it relates to the **[VSOs]** *Group 2 comparator, William Hill*.

*Mulhall*, 19 F.3d at 593. Just as with the "important differentiating factor" case law outlined above in the analysis of "equal effort," this Circuit made clear in *Mulhall* that the amount of time (or lack thereof) that an employee actually utilizes a skill is not necessarily indicative of that skill's importance to the job.[26] Surely the prominence placed by the Alabama Legislature on the skill of

---

[25] Accordingly, the court respectfully disagrees with Judge Fuller's assessment that "Plaintiffs' evidence is sufficient to establish that being a veteran is not necessary to perform the job [of VSO]." (Doc. # 120, at 29).

[26] This concept is bolstered by the persuasive Eleventh Circuit affirmance of another district court's application of the "important differentiating factor" analysis to the "equal skill" prong of the *prima facie* case. *See Beall v. Curtis*, 603 F.Supp. 1563 (M.D.Ga.), *aff'd without op.*, 778 F.2d 791 (11th Cir.1985). In *Beall*, the district court concluded that the six female nurse practitioner plaintiffs who were employed at the University of Georgia Health Service failed to satisfy their EPA *prima facie* burden because the skill required of their positions was not comparable to that of a physician's assistant (Curran) who "possesse[d] skills, by virtue of his experience, training, education, and ability, that plaintiffs have not acquired." *Beall*, 603 F.Supp. at 1578. The court observed,

veteran status - as demonstrated by its codification in statute - is at least equal to the court's hypothesis in *Mulhall* that "investigative skills no doubt play some role in one's ability to direct investigations." *Mulhall*, 19 F.3d at 593. Thus, the court alternatively concludes that the skill of wartime veteran status "is more than an incidental part" of the VSO position, distinguishing it from the CVAA position under the "strict similarity" requirement. *Mulhall*, 19 F.3d at 593.

---

> Numerous witnesses testified about the training, skills used, and available skills of plaintiffs and of Mr. Curran. There is no doubt that the physicians, registered nurses, physician's assistants, and nurse practitioners who work at the University of Georgia Health Service usually provide identical or substantially similar health care services to patients. The overlap of categories of health care providers does not, however, make irrelevant the different levels of medical competence, skill, and expertise, or the different responsibilities, of persons in different categories. No one would argue that a physician and a nurse who routinely handle identical problems and provide identical treatment perform an identical job; a physician is expected to demonstrate greater expertise that makes him or her more valuable in the unusual case.

*Beall*, 603 F.Supp. at 1570-71. Although the nurse practitioner plaintiffs suggested that any extra skills possessed by the physician's assistant were a "'superfluous, expensive redundancy,'" and they urged the court to "compare skills actually required and used on the job rather than skills that create merely hypothetical differences in job performance," the court rejected plaintiffs' attempt to equate the minimal time devoted to using those skills with their importance to the overall job content. *Beall*, 603 F.Supp. at 1578. Relying on the "important differentiating factor" case law from the former Fifth Circuit, the court observed that "even if Mr. Curran's skills are seldom used, whether that is because patients needing those skills rarely appear at the Health Service, or consult physicians there instead, or are immediately referred to an outside hospital, they are relevant to distinguish his work from that of plaintiffs." *Beall*, 603 F.Supp. at 1578. Although the Eleventh Circuit affirmed that reasoning without opinion, it also cited with approval to the *Beall prima facie* case analysis in *Waters v. Turner, Wood & Smith Ins. Agency, Inc.* 874 F.2d 797, 800 (11th Cir. 1989).

Just as the district court observed in *Beall* with respect to certain skills possessed by practitioners in the field of medicine, the state legislature has determined that when it comes to serving the veterans of Alabama, "the availability of skills not often used is an important component of competence . . . ." *Beall*, 603 F.Supp. at 1578. Although a VSO's background may not determine which case he or she is assigned when a veteran walks in the door, it cannot be said that such a skill is completely unnecessary to the VSO position when considering job content as a whole.

The court has struggled in vain for months to find the perfect analogy that can be likened to the facts of this case.  Perhaps the unique nature of a comparator position created by state statute in the public sector - which is like forcing a square peg into the round hole of a federal statute originally drafted to remedy pay differentials in private industry - is to blame for the lack of kindred fact patterns.  In any event, the court finds that the characteristics of the CVAA and VSO positions are not unlike the circumstances of the two law clerks who were appointed to work for the undersigned. Both law clerks are paid by the Administrative Office of the United States Courts.  Both expend substantially similar effort in attending to their day-to-day job duties because each is responsible for managing approximately half of the undersigned's civil cases.  Like the veteran cases handled by CVAAs and VSOs in the county offices, cases are not routed to one law clerk or the other based upon experience or education or any other qualification - they are merely assigned randomly based upon whether the terminal digit of the civil action number is even or odd.  To any outsider looking in, the job content of the law clerks' primary duties would appear virtually identical.

Nonetheless, despite the appearance of similarity, each law clerk has a different appointment in the federal system based upon the job requirements for those positions.  One of the law clerks is a male who recently graduated from law school with no prior work experience.  Because he lacks post-graduate experience, no matter what other credentials or skills he brings to the table, he is only eligible for the "JSP-11" level appointment - which then corresponds with a certain salary range.  *See* https://lawclerks.jdc.ao.dcn/employinfo.htm.  On the other hand, the second law clerk is a female who has two years of post-graduate work experience which qualifies her for a "JSP-13" level governmental appointment and entitles her to a much higher pay scale.  The reasoning behind the higher appointment level available to her is obvious - although she may not use the experience

gleaned from her post-graduate work experience in daily practice, it is available for her (and the undersigned) to draw upon when a matter requires it.

Just like the Plaintiffs, who may perform the same day-to-day duties as a VSO but are not statutorily eligible to be paid as a VSO because they are not veterans, the law clerk who is a recent graduate lacks the post-graduate work experience that would qualify him for a different federal appointment and higher pay scale. In both my chambers and at the Alabama VA, the skill required for the higher paid position applies to all persons who hold that job regardless of gender and thus is the very reason why the positions and pay of those two employees simply cannot be compared at all.

Plaintiffs' failure to satisfy the "equal skill" prong of the test, just as with the "equal effort" prong, is independently fatal to their EPA claims. Nonetheless, the court will forge ahead to the final stage of the *prima facie* analysis.

### c. Equal Responsibility

"Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." 29 C.F.R. § 1620.17(a). Just as the "veteran status" skill required by statute could not be brushed aside as a theoretical job description, the same is true of the level of accountability required of a VSO as outlined in the Code. When establishing the VSO position, the Alabama Legislature prescribed *intrinsic* accountability: "The [VSO] . . . shall be administratively responsible to the [Director of VA]." Ala.Code § 31-5-10 (a). That all VSOs are held responsible by the Director for the "faithful performance of their official duties" is sealed by the requirement that each VSO take an oath of office and have a surety bond executed on his or her behalf. Ala. Code §§ 31-5-11 (1975). It is undisputed that CVAAs are not

required to execute a surety bond or take an oath of office, nor are they held administratively responsible to the Director of VA.

Although the statutory accountability outlined above should *alone* be sufficient to distinguish the responsibility of a VSO from that of a CVAA, additional accountability is required of the VSOs as "rating supervisors" over the CVAAs. Despite that "most of the Plaintiffs assert that VSOs are supervisors in name only," *Prewett*, 419 F.Supp.2d at 1356, there is no dispute that VSOs are *the* rating supervisors on the CVAAs' annual performance appraisals. Although Plaintiffs focus on the minimum amount of time VSOs expend actually putting pen to paper on the annual performance reviews (some of the CVAAs aver that they filled out their own reviews that the VSOs then signed), that argument is merely a quarrel with whether or not certain VSOs are putting forth their best effort when rating the performance of their respective CVAAs. It does not change the undisputed fact that VSOs are held accountable as the rating supervisors over CVAAs – in other words, a VSO must appraise the sum and substance of his or her assigned CVAA's year-long performance, even if the actual completion of the review form takes a matter of seconds. "Supervising more employees . . . requires greater skill, effort, and responsibility." *Slattery v. Precision Response Corp.,* 167 Fed.Appx. 139, 143 (11th Cir. 2006) (citing *Irby*, 44 F.3d at 954; *Waters*, 874 F.2d at 799-800). For this independent reason, the VSO and CVAA positions are not comparable in responsibility or accountability for EPA purposes.

The court has outlined above three independent reasons why Plaintiffs have failed to satisfy their *prima facie* EPA burden in this case and Defendants are due summary judgment on those claims. Alternatively, however, the court finds that even if the Plaintiffs could establish a *prima*

*facie* case and thus shift the burden to Defendants to demonstrate the application of an affirmative defense, summary judgment in Defendants' favor is still warranted.

### 2.      The Affirmative Defenses

Under the EPA, once the employee presents a *prima facie* case, the employer may avoid liability by proving by a preponderance of the evidence that the pay differences are based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) . . . any other factor other than sex." 29 U.S.C. § 206(d)(1).  The fourth affirmative defense (*i.e.,* any factor other than sex) is a broad "catch-all" exception, *Corning Glass Works*, 417 U.S. at 197, that encompasses an almost limitless number of gender-neutral factors.  The availability of that defense prevents courts from substituting their judgment for the employer's judgment. *County of Washington v. Gunther*, 452 U.S. 161, 171 (1981).

The Eleventh Circuit has made clear that the burden to prove these affirmative defenses is heavy, and the employer must demonstrate that "the factor of sex provided no basis for the wage differential."  *Mulhall*, 19 F.3d at 590.  In this case, Defendants have asserted that two of the four available affirmative defenses are the real reasons for the pay differential: (1) a merit system; and (2) a  "factor other than sex." (*See* Doc. # 74, at 31).  The court will discuss each defense in turn.

Just as Judge Fuller found in his Summary Judgment Opinion, Defendants' reliance on the *bona fide* "merit system" defense can be disposed with in short order.  Although the court does not disagree with Defendants that the Alabama Merit System Act, under which the CVAAs are employed and paid, qualifies as a *bona fide* merit system that does not discriminate on the basis of sex (*see* Doc. # 74, at 31; *see also Prewett*, 419 F.Supp.2d at 1357), the Alabama Merit System *alone* fails to explain the pay differential between VSOs and CVAAs.  As Judge Fuller noted, "Plaintiffs

and their comparators are not part of the same merit system, [and] their relative pay has not been determined objectively by the same system." *Prewett*, 419 F.Supp.2d at 1357.  "[T]he fact that the CVAAs are governed by a merit system is not any evidence that their pay has been determined fairly in relation to the VSOs' pay." *Prewett*, 419 F.Supp.2d at 1357.   The court finds, therefore, as did Judge Fuller, that Defendants cannot explain the pay differential at issue here by pointing to the narrow "merit system" defense.  That failure, however, does not preclude Defendants from relying on evidence that the CVAAs' pay is determined by the Alabama Merit System as part of their "factor other than sex" explanation for the pay differential, to which the court now turns.

To establish the "factor other than sex" affirmative defense, an employer may not rely on a "general practice" but may consider factors such as the " unique characteristics of the same job; ... an individual's experience, training or ability; or . . . special exigent circumstances connected with the business." *Glenn v. General Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir.1988).  "Experience is an acceptable factor other than sex if [it is] not used as a pretext for differentiation because of gender." *Irby*, 44 F.3d at 956.  The Eleventh Circuit has strongly suggested that the factor other than sex must be business-related. *See Price v. Lockheed Space Operations Co.*, 856 F.2d 1503, 1506 (11th Cir. 1988) (remanding for jury determination of whether any additional and legitimate business reasons existed); *Glenn*, 841 F.2d at 1571 (noting that exigent circumstances should be "connected with the business").  At the very least, Defendants must present "an explanation of how those factors actually resulted in an individual employee earning more than another."  *Brock v. Georgia S.W. Coll.*, 765 F.2d 1026, 1037 (11th Cir.1985), *overruled on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988).

In their initial brief in support of summary judgment, Defendants offered the following explanation of their "factor other than sex" defense:

> [T]he State of Alabama has in place a valid merit system that does not discriminate on the basis of sex. *See* Ala. Code §§ 36-26-1, *et. seq.* (1991). Moreover, the Alabama state statutes require VSOs to be Veterans and provide[] that VSOs be non-merit employees. *See* Ala. Code §§ 31-5-3(d), 31-5-9 (1998). Thus, VA has in place a "dual classification system" for VA employees. The presence of a "dual classification system," the requirement of Veteran status, and a good faith belief that employees were properly classified are all a "factor other than sex." Any creation of a new classification without appropriate justification that would effectively allow white employees to pass over higher ranked minorities could be a violation of the *Frazer* order.

(*See* Doc. # 74, at 31). When Judge Fuller analyzed that defense in his Summary Judgment Opinion, he separated Defendants' arguments into four "factors other than sex" that he analyzed as stand-alone defenses: (1) the dual classification system; (2) the veteran status requirement; (3) Defendants' good faith belief that all employees were properly classified; and (4) the fact that creation of a new classification could violate the *Frazer* order. *Prewett*, 419 F.Supp.2d at 1357-58. After parsing out the evidence that supported each of those factors, Judge Fuller concluded that none of the four proffered explanations were independently sufficient to entitle Defendants to judgment as a matter

25

of law.[27]   Based upon that paradigm of four separate "factors other than sex," this court agrees that

none of those reasons - standing alone - explains the pay differential in this case.[28]

However, the undersigned respectfully disagrees that the components of Defendants' "factor

other than sex" defense can be considered independent of one another.   Although the reasoning

offered by Defendants consists of several layers, those layers are inextricably intertwined by the

statutory scheme underlying the facts of this case.   In other words, when properly viewed,

Defendants' "factor other than sex" explanation should be analyzed comprehensively as a whole, and

the whole is greater than the sum of its parts.   With the paradigm shifted to this perspective, for the

reasons outlined in more detail below, the court finds as a matter of law that the disparity between

the pay of CVAAs and VSOs is not based on sex, but is a byproduct of the different statutes that

govern those positions.

---

[27] Specifically, Judge Fuller found that, as a matter of law, Defendants failed to meet their heavy burden as to the dual classification system defense and the defense regarding a potential violation of the *Frazer* order.   *Prewett*, 419 F.Supp.2d 1338, 1357-59.   Although Judge Fuller found that Defendants "did present adequate evidence to create an issue of fact as to whether they may assert the 'factor other than sex' defense on the basis of the veteran status requirement or a good faith belief that Plaintiffs were properly classified," he ultimately concluded that the factfinder should decide whether "those two claimed factors other than sex were not the real reasons for the pay disparity, and that the pay disparity was due to sex." *Prewett*, 419 F.Supp.2d 1338, 1359-61.

[28] That is not to say that "[i]f applied in good faith and in a nondiscriminatory manner, . . . wartime veteran status can[not] be a legitimate factor other than sex." *Fallon v. State of Illinois*, 882 F.2d 1206, 1212 (7th Cir. 1989).   In this case, veteran status certainly explains why VSOs are VSOs and CVAAs are not.   However, veteran status does not - standing alone - paint the whole picture of why VSOs and CVAAs are paid differently. As outlined in more detail *infra*, veteran status must be viewed in the context of the statutory dual classification system which establishes the pay differential between VSOs and other VA support personnel (including CVAAs).   There is no evidence that the Alabama Legislature acted in bad faith or with a discriminatory purpose when it created, some sixty-odd years ago, the statutory classifications that apply to VSOs and CVAAs.   Thus, veteran status - the distinguishing characteristic of the different pay classifications in the statutory scheme - has been "applied in good faith and in an nondiscriminatory manner" in this case.

It is undisputed that *by statute* the CVAAs and the VSOs fall under two different systems of pay - as Defendants put it, the VA employs a "dual classification system."  The statute provides as follows:

> (d) The state board shall have the power, and it shall be its duty, to fix the salaries and minimum standards of service and personnel of all service commissioners, and subject to the State Merit System, where applicable, to fix salaries and minimum standards of service and personnel, according to the schedules and rules prescribed by the State Personnel Board, for other employees and personnel.

Ala. Code § 31-5-10(d).  Thus, the pay of VSOs (to whom the statute refers as "service commissioners") is left completely to the discretion of the VA.  *See* Ala.Code § 31-5-3 (d) ("The [State Board of Veterans' Affairs] shall have the power, and it shall be its duty, to fix the salaries and minimum standards of service and personnel of all service commissioners . . . ").  VSOs are not entitled to the protections of the Alabama Merit System Act but instead are paid at the pleasure of the Director of VA.[29]

On the other hand, although the statute gives the VA Director input into the pay of CVAAs as  "other employees and personnel," VA input is "subject to the State Merit System" and limited by "the schedules and rules prescribed by the State Personnel Board." Ala.Code 1975 § 31-5-3(d).

---

[29] As Judge Fuller's recitation of the facts explains:

> The Director of VA has the authority to hire, dismiss, establish salaries, and determine merit raises for VSOs. VSOs may be dismissed for cause, including conduct unbecoming a VSO. A VSO may request review of the dismissal by the State Board of Veterans' Affairs, but review is discretionary. After the Director of VA hires an individual, that individual assumes the responsibilities of a VSO for a six-month probationary period. Upon successful completion of the probationary period, the Director of VA recommends the individual for approval to the State Board of Veterans' Affairs. If the Board approves, the individual then becomes a VSO.

*Prewett*, 419 F.Supp.2d at 1345-46.

27

As beneficiaries of the State Merit System Act, CVAAs are entitled to the range of pay (and other benefits) established for their designated classification of "Administrative Support Assistant" or "ASA"- a classification that includes a number of clerical employees employed statewide in numerous state agencies.[30] Thus, while the Alabama VA may be able to "fix" where a CVAA's pay falls within the range of pay established for their ASA classification, the VA has no authority to step outside of that classification and pay a CVAA more than any other state employee who is classified as an "ASA."[31]

The practical application of that statutory limitation is that many of the CVAAs - including many of the Plaintiffs in this case - are "topped out" at the high point of their ASA pay range. Indeed, the evidence is undisputed that just prior to the filing of this lawsuit, Defendants implemented a statewide CVAA reallocation such that, if a CVAA was eligible to be promoted, she was.[32] As many CVAAs reach the height of their allowable pay in the ASA classification, the pay

---

[30] The Alabama Merit System Act, Ala.Code § 36-26-1, *et seq.*, governs benefits and regulations concerning, among other things, the hiring process, job performance standards, promotion, transfer, demotion, layoff, dismissals, suspension, classification of positions, and salary plans. The regulations include a guaranteed right to appeal terminations and disciplinary actions. The State Personnel Department, with the approval of the Governor and the Finance Director, sets the salary ranges for all Merit System employees, including CVAAs. The SPD Director recommends pay plans for each classification to the SPD Board, and the SPD Board then adopts the pay plans with the approval of the Governor. The CVAAs are assigned to work for the Alabama VA and their salaries are paid from the Alabama VA budget.

[31] Ironically, the VA Director has, "[o]n numerous occasions since 1983 . . . requested that CVAAs be compensated at a higher rate." *Prewett*, 419 F.Supp.2d at 1348.   The VA has even lobbied on behalf of the CVAAs for the creation of a new position classification.   *Prewett*, 419 F.Supp.2d at 1348-49.  The parties agree that, for reasons outlined *infra*, all requests to pay CVAAs outside of the ASA classification ultimately have been rejected.

[32] "In January 2000, all CVAA positions were reallocated to the highest possible classifications within the ASA series. CVAAs were required to take appropriate merit system examinations and score high enough to be 'reachable' on the register (ranked in the top 10). All

of VSOs continues to rise with every discretionary raise granted by the Director of VA, who is not restrained by a legislatively-established ceiling in the determination of VSO salaries.

Although, in theory, the creation of a new Merit System classification for CVAAs could reset the upper-limit of their pay range to be commensurate with the higher pay of their comparator VSOs, Defendants have explained that they cannot simply create a new classification at the drop of a hat. Rather, for the better part of the time that this action has been pending, and for years before it was filed, the creation of a new classification for Plaintiffs was negatively affected by two things: (1) the "no-bypass rule" of the *Frazer* order[33] prohibiting the appointment of any White candidate if a higher-ranking African-American candidate is eligible for the position; and (2) the relationship that the CVAAs share with other employees statewide who are classified as ASAs under the SPD system. (Doc. # 74, at 39-44). First, Defendants point out that, "[t]he creation of a new classification [would violate the *Frazer* order because it] would effectively allow employees who would otherwise be blocked by the *Frazer* order to achieve promotions to which they would not otherwise be entitled."

---

Plaintiffs who were eligible to be promoted were promoted." *Prewett*, 419 F.Supp.2d at 1348-49.

[33] *Frazer* refers to the case of *United States v. Frazer*, 317 F.Supp. 1079 (M.D.Ala.1970), which alleged a pattern and practice of race discrimination in the Alabama Merit System. The *Frazer* no-bypass rule is as follows:

> Defendants shall not appoint or offer a position to a lower-ranking white applicant on a certificate in preference to a higher-ranking available Negro applicant, unless the defendants have first contacted and interviewed the higher-ranking Negro applicant and have determined that the Negro applicant cannot perform the functions of the position, is otherwise unfit for it, or is unavailable. In every instance where a determination is made that the Negro applicant is unfit or unavailable, documentary evidence shall be maintained by the defendants that will sustain such finding.

*Frazer*, 317 F.Supp. at 1091.

(Doc. # 74, at 43-44).  Although the court agrees with Judge Fuller that Defendants cannot rely *solely* on a hypothetical violation of the no-bypass rule as their entire "factor other than sex" defense, *see Prewett*, 419 F.Supp.2d at 1360, it nonetheless is a relevant part of Defendants' comprehensive explanation that a number of variables like the *Frazer* order - and not the factor of sex - have had an impact on the pay differential here.

Defendants also explain that any efforts to create a new classification are limited by the fact that the CVAAs are not the only employees in the "ASA" Merit System designation; the "ASA" classification encompasses not only Alabama VA employees but also many other clerical positions in numerous state agencies across Alabama.  Through both internal audits and validation studies conducted by outside experts, the State Personnel Department has "on [many] occasions, reviewed the job duties and responsibilities of the ASAs who are employed by the Department of Veterans Affairs.  On each and every occasion, it was determined that the job duties and responsibilities of these positions are clerical in nature and fall within the existing job classification of ASA." (Doc. # 73, Ex. B, Affidavit of Tommy Flowers, at 5 and Ex. 2).  For example, internal audits revealed that the counseling services provided to veterans by CVAAs were comparable in responsibility and type to the duties of ASA-series employees at the County Health Department and the General Contractors Licensing Board.  (Flowers Affidavit, at 8-9 and Ex. 2). "While the focus of many clerical positions [in the ASA series] differ from agency to agency, the overall tasks, responsibilities, scope, and level of work performed are comparable."  (Flowers Affidavit, at 9).  Thus, any momentum to create a new classification for CVAAs cannot be viewed in a vacuum:  "[t]o provide specific classifications for each [state] agency would frustrate the concept of position classification and . . . hinder[] the

efficient and effective administration of the merit system." (Flowers Affidavit, at 9-10).[34]   The creation of a special CVAA classification would also undoubtedly lead to assertions by other employees in the ASA classification (who do not work for the VA) that CVAAs should not be paid at a higher rate than them.[35]

The undisputed evidence shows that the "no-bypass rule" and the relationship of CVAAs to other ASA-series employees are gender-neutral considerations that impacted the decision to continue paying CVAAs in the ASA classification.  Although it may be argued that either reason standing alone is insufficient to justify the pay differential between CVAAs and VSOs, they are valid

---

[34] As Defendants explained at the January 24, 2007 oral argument on the motions to reconsider:

> MS. BYRNE [on behalf of Defendant SPD]: In *Reynolds* we were required to undertake a massive job study of the job classifications in the state that were in use at the Department of Transportation. Nearly 200 classifications.
>
> THE COURT: Are there ASA positions used with the Department of Transportation?
>
> MS. BYRNE: Yes, Your Honor. And those were identified. They were looked at by outside experts; looked at by ourselves.
>
> THE COURT: And validation studies?
>
> MS. BYRNE: Validation studies, yes, Your Honor, absolutely; performed by outside experts who came in and examined our system. So we could not under any circumstances go in and say oh, well, yes, because you can't get past a minority under *Frazer*, we are going to create a new classification, even though we have already determined, and outside experts have determined, and the Court has determined that these job duties are appropriate in this classification.

(Doc. # 229, at 85).

[35] Indeed, the internal reviews and validation studies initially conducted at the behest of the CVAAs would bolster any such claims because they indicate that CVAAs are properly classified as ASAs.

limitations on the ability of Defendants to alter the pay differential and therefore must be considered together as part of Defendants' comprehensive explanation.  It is not this court's job to second-guess the valid business decisions of Defendants, nor to find that Defendants *should have* created a new classification for the CVAAs.  *Gunther*, 452 U.S. at 171.  Rather, this court's focus is limited to whether Defendants have shown that business-related, non-sex based reasons explain the pay differential.

The court recognizes that, in the context of dual pay systems, the Eleventh Circuit has intimated (in footnote dicta) that the mere fact that two systems exist will not *alone* satisfy Defendants' affirmative defense burden under the EPA "without record support that experience and background justify the pay disparity." *Glenn v. General Motors Corp.*, 841 F.2d 1567, 1571, n. 9 (11th Cir. 1988).[36]  Even if that is the law of this Circuit, the statutory requirement of "veteran status" provides that justification here – to qualify for pay determined solely by the Director of the VA outside of the Merit System, one must have the background and experience as a veteran that

---

[36] In *Glenn*, the Eleventh Circuit rejected the defendant's attempt to justify a pay disparity between female and male salaried workers by relying on a corporate-wide policy that prohibited hourly employees from taking a pay cut when transferring to salaried positions like the ones held by the male comparators in that case.  *Glenn*, 841 F.2d at 1570-71.  The court agreed with the district court's finding that the "policy" was nothing more than a potentially violative practice to pay workers what it takes to induce them to accept employment and noted that historically women have been hired at lower starting salaries.  *Glenn*, 841 F.2d at 1570-71.  In so finding, the court dropped a footnote rejecting defendant's reliance on a Fourth Circuit case "for the proposition that pay disparity is justified when it results from two distinct nondiscriminatory merit systems" and noting that defendant could not justify the pay disparity of the "basis of the systems alone, without record support that experience and background justify the pay disparity." *Glenn*, 841 F.2d at 1571, n. 9. Although the relevant footnote in *Glenn* is dicta, it makes logical sense that an employer should not be permitted to satisfy its "heavy burden" of production on this defense by simply pointing out that the plaintiff is part of a merit system while her comparator is not.  Such a cursory explanation for the pay disparity would not demonstrate that the relative pay of the plaintiff and her comparator has been determined objectively by the same standards.

qualifies a person to be a VSO.  As outlined in the statutory scheme, VSOs and CVAAs were not arbitrarily segregated into two different classifications.  Rather, the Alabama Legislature has made clear that being a veteran - not being of a certain gender - is the threshold that must be crossed for an employee of the VA to qualify for the classification paid outside of the Merit System. It is not the prerogative of this court to question whether the Alabama Legislature made a good decision when it chose "veteran status" as the differentiating factor between the two pay classifications because that amounts to nothing more than a challenge to the validity of the statute.[37]  The court must only

---

[37] And perhaps the lack of constitutional challenge in this case is due in part to the Supreme Court's pronouncement that a statute bestowing a job preference on veterans - even if that preference is absolute and disadvantages women - nonetheless passes constitutional muster in the absence of evidence of purposeful discrimination.  *See Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979).  As the Court noted, "[t]he calculus of effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility." *Feeney*, 442 U.S. at 272.

analyze whether the statutory designations justify the pay disparity for reasons other than sex.[38]

Here, there is no evidence to the contrary.[39]

---

[38] In light of the fact that Plaintiffs have not challenged the constitutionality of the "veteran status" requirement, Defendants moved earlier in this case to clarify their burden of proof regarding the legitimate business purpose of that requirement:

> It is disingenuous for Plaintiffs to claim that they are not attacking the veteran requirement in the [Alabama] statute and then argue that Defendants have to prove that same veteran status is justified by business necessity [under the "factor other than sex" defense].  Plaintiffs cannot have it both ways: either they are attacking the veteran status requirement of the statute or they are conceding that it is a legitimate business necessity.

(Doc. # 161, at 2-3).  The court denied Defendants' motion and held that because "Plaintiffs concede that they have not challenged the constitutionality of the statute establishing the veteran status requirement for Veteran Service Officers, . . . [] the 'rational basis' standard of review used to analyze the constitutionality of a statute is not applicable in this case."  (Doc. # 220).  The court then outlined the following standards to be applied to the affirmative defense, which it has relied upon in this opinion:

> (1) the burden of proof for the affirmative defense is on the employer, *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995); (2) the employer must provide "an explanation of how those factors [other than sex] actually resulted in an individual employee earning more than another," *Brock v. Georgia S.W. Coll.*, 765 F.2d 1026, 1037 (11th Cir. 1985) *overruled on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988); and (3) the employer *may* need to show that the "factor other than sex" has a legitimate business purpose, *Price v. Lockheed Space Operations Co.,* 856 F.2d 1503, 1506 (11th Cir. 1988); *Glenn v. General Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988).

(Doc. # 220).

[39] Although Plaintiffs point to statements from various employees of Defendant who suggest that the employment of CVAAs to do VSO work means that the VA can get the same work "on the cheap," that does not suggest that sex played a role in the pay disparity.  It is undisputed that neither the CVAA or VSO position is open to only one gender - indeed there are both male and female VSOs- and therefore even if cost motivated the establishment of two different pay systems, it was not targeted at one gender.

Other Circuits that require employers to demonstrate that business-related reasons justify the pay differential have accepted pay systems motivated solely by cost control, of course always with the proviso that the systems themselves are not sex-based. *See Belfi v. Prendergast*, 191 F.3d 129,

In the end, it is the statutes, and not Defendants, that have assigned separate pay systems to each of the jobs at issue here.  It is neither within the authority of Defendants nor this court to force the CVAAs and VSOs into the same pay system where their wages can be appropriately weighted against one another.  As Judge Fuller recognized, it would literally require a "change in the law" by the Alabama Legislature to accomplish that feat.  *See Prewett,* 419 F.Supp.2d at 1349 ("The majority of CVAAs, including many of the Plaintiffs, oppose any change in the law that would remove them from the Alabama Merit System. Wilkes and the Alabama VA management are opposed to a change

---

136 (2nd Cir. 1999); *EEOC v. J.C. Penney*, 843 F.2d 249, 253 (6th Cir. 1988).  Additionally, the Act's legislative history suggests that wage differentials implicating the total cost of employing both men and women are exempt from the Act's scope:

> It is the intention of the committee that where it can be shown that, on the basis of all of the elements of the employment costs of both men and women, an employer will be economically penalized by the elimination of a wage differential, the Secretary can permit an exception similar to those he can permit for a bona fide seniority system or other exception ...

S.Rep. No. 88-176, 1st Sess., at 4 (1963).  As the Court of Claims aptly noted:

> As long it is not based upon the lesser cost of employing one sex versus the other, an employer's attempt to minimize cost is a valid business reason for implementing a pay and classification system. What, indeed, could be more basic to private enterprise than minimizing costs while maximizing income? Achieving economy in government, however elusive a goal, is also a most desirable aspiration. While Congress might be accused of wasting taxpayers' money, could a court read into the Act a legislative intent to preclude cost-savings as a legitimate business justification for the federal government?

*Lissak v. U.S.,* 49 Fed.Cl. 281, 287 (Fed.Cl. 2001).  As outlined above, the court is not in a position to question whether the Alabama Legislature had valid reasons for enacting the statutory dual classification system in this case.  Nonetheless, even if it were appropriate for the court to scrutinize the legislature's intent, being motivated to contain costs by paying CVAAs and VSOs differently is certainly a valid business reason - especially in the context of public employment.

in the law that would bring the VSOs under the Alabama Merit System.").[40] In the absence of intervention by the legislature, the pay of VSOs and CVAAs will continue to track parallel paths.

The court is fully mindful of Congress' intent that the exemptions in the Equal Pay Act be narrowly construed and recognizes that it is difficult, but not impossible,[41] to dispose of an affirmative defense by way of summary judgment because "credibility and the weight to be given to such 'explanations' are traditionally matters left to the consideration of factfinders." *Mulhall*, 19 F.3d at 595. Nonetheless, the facts of this case are quite different from those at issue in a typical EPA case. The "explanations" proffered by Defendants as factors other than sex are not merely reasons that they, as employers, have articulated to explain the pay differential. Rather, those "explanations" are based in part on statutory provisions articulated by the state legislature, the validity of which has not been constitutionally challenged in this case. Under these unique circumstances, the court is persuaded that Defendants have satisfied their heavy burden of showing they are entitled to summary judgment on the issue of whether the factor of sex provided any basis for the wage differential here.

---

[40] Accordingly, whether or not Defendants desire for VSOs and CVAAs to be consolidated into one pay system is immaterial here. They do not have the power to make that happen and neither does this court.

[41] *See, e.g., Hudson v. Mr. Burch Formal Wear, Inc.,*193 Fed.Appx. 859 (11th Cir. 2006) (affirming grant of summary judgment on affirmative defense because Plaintiff failed to show that Defendant's reason for the pay differential was pretextual); *Gossage v. Wal-Mart Stores, Inc.,* 2007 WL 2874781, at *8 (M.D.Ga. September 27, 2007) ("[T]he Court finds that the undisputed evidence establishes the validity of Defendant's affirmative defense. Since no genuine issues of material fact exist regarding Defendant's affirmative defense, Defendant is entitled to summary judgment on Plaintiff's EPA claim").

This court is not the first district court in this Circuit to find that statutory differences between two positions can result in a valid EPA affirmative defense. In *Beall v. Curtis*, *supra*, the Middle District of Georgia concluded that although there were many similarities between the jobs of "nurse practitioner" and "physician's assistant," state law prescribed statutory differences between the positions, resulting in a valid defense to plaintiff's EPA claim. *Beall*, 603 F.Supp. at 1579-80. Specifically, the court noted that nurse practitioners were, by law, limited in their practice to certain protocols, while physician's assistants were, by law, permitted to perform "any function performed by the applying physician." *Beall*, 603 F.Supp. at 1579 (quoting Ga. Code. Ann. § 43-34-103(d)). Thus, the court concluded that the distinction in job functions articulated by state statute constituted a "factor other than sex" justifying a pay differential. *Beall*, 603 F.Supp. at 1580.[42]

---

[42] Particularly relevant to this case is that the *Beall* court relied on the statutory distinction in job functions as a "factor other than sex" in spite of the fact that plaintiffs and their comparators "usually provide identical or substantially similar health care services to patients." *Beall*, 603 F.Supp. at 579-80. The court held:

> Despite the many similarities, there is one important difference which affords defendants a valid defense. A physician's assistant may perform "any functions performed by the applying physician which the physician's assistant is qualified to perform." Off.Code Ga.Ann. § 43-34-103(d). Thus, even though the practice of a physician's assistant is normally limited to the powers contained in the job description upon which his or her certification is based, the job description is not absolutely binding. Even if the job description were binding, Mr. Curran's job description lists, under "therapeutic duties", the duty to "[p]erform all functions as dictated by demonstrated education and competency as directed by and under the supervision of the physician."

> No similar provision exists for plaintiffs. To the contrary, a rule of the Georgia Board of Nursing states that a nurse practitioner "must practice according to written protocols mutually agreed upon by the Nurse Practitioner and physician for all delegated medical functions." Ga.Admin.Comp. 410-12-.01(5). The protocols governing the practice of plaintiffs at the Health Service clearly state at the outset that "[i]f there is no guideline defining a condition and its management, the nurse practitioner must not diagnose or treat the condition without direct physician

The statutes in this case are far more convincing than the regulatory scheme in *Beall* as a "factor other than sex" that explains the pay differential.  In *Beall* - unlike in this case - it was undisputed that "the State of Georgia has, in its merit system, treated nurse practitioners and physician's assistants alike" despite the statutorily-defined differences in the two positions.  *Beall*, 603 F.Supp. at 1580.  Nonetheless, the *Beall* court rejected Plaintiffs' argument that it "must or may ignore these legislative and regulatory distinctions" simply because "another unit of the state [] may employ nurse practitioners and physician's assistants in the same capacity," finding instead "no adequate reason to conclude that the classifications are improper or insignificant and may not be relied upon." *Beall*,  603 F.Supp. at 1580.  Unlike *Beall*, the statutes in this case not only distinguish the characteristics of the CVAA and VSO positions, but they also create separate pay structures for those positions.

When all parts of the equation are viewed together in light of the statutory scheme, the court finds that Defendants have offered a cohesive explanation "of how those factors actually resulted in an individual employee earning more than another." *Brock*, 765 F.2d at 1037.   For all of these reasons, the court concludes that even if Plaintiffs have overcome their *prima facie* burden, Defendants have created a pay differential based upon a legitimate "other factor other than sex."

---

involvement."

As a result, Mr. Curran's professional status, as recognized by statute and regulations, makes his job different from those of plaintiffs. He can legally perform medical treatment beyond the written confines of specifically enumerated powers, as long as he has the education and competence necessary to do so. Plaintiffs cannot. No matter how well trained, no matter how able, nurse practitioners are confined by their guidelines and protocols. Their practice is less flexible, and they may not lawfully perform some medical services that Mr. Curran is entitled to perform.

*Beall*, 603 F.Supp. at 1580.

### 3.    Evidence of Pretext

The EPA analysis set forth by the Eleventh Circuit provides that at this stage, where Defendants have successfully established that the basis for the divergent rate of pay falls under one of the four statutory defenses, the burden then shifts once more to Plaintiffs who must rebut the proffered justification with "affirmative evidence that [the proffered reason] is pretextual or offered as a post-event justification for a gender-based differential." *Irby*, 44 F.3d 949 (finding that if the plaintiff is able to create the inference of pretext, there is an issue which should be reserved for trial). Such a requirement presents a conundrum, however, as the court has already determined that the undisputed evidence establishes the validity of Defendant's affirmative defense that "the factor of sex provided *no basis* for the wage differential." *Mulhall*, 19 F.3d at 590.  In so finding, this court has already - and necessarily - considered Plaintiffs' evidence that sex did pay a role in the differential.

At this point, a separate inquiry into whether Plaintiffs have presented "affirmative evidence" of pretext would merely repeat the court's prior analysis.  Indeed, as the court in *Mulhall* noted, because "the exceptions granted within the EPA constitute affirmative defenses . . . .[, i]f proven, defendant is absolved of liability as a matter of law." *Mulhall*, 19 F.3d at 590.[43] Nevertheless, out of an abundance of caution, the court separately concludes that the record is clearly void of affirmative evidence that "the explanation [for the pay disparity] ... is pretextual or offered as a

---

[43] The *Beall* court also skipped a separate analysis of pretext evidence and terminated the analysis when it found that Defendants had met their burden as to the affirmative defense by relying on a statutory scheme that distinguished the positions. *Beall*, 603 F.Supp. at 1580 ("Because the Court concludes that plaintiffs have failed to establish a prima facie case and that, in any event, defendant Board of Regents has created a pay differential based upon a legitimate "other factor other than sex," the Court determines that defendant Board of Regents prevails on plaintiffs' Equal Pay Act claim.")

post-event justification for a gender-based differential." *Steger*, 318 F.3d at 1078 (internal quotation

marks and citation omitted). Plaintiffs' failure to "create the inference of pretext," *Irby*, 44 F.3d at

954, is the final fatal blow to their EPA claims.

     For each and all of the independent reasons outlined above, the court finds that Defendants

are due summary judgment on all of Plaintiffs' EPA claims.

**B.**    **Title VII Claims**

     Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . .

to discriminate against any individual with respect to compensation . . . because of such individual's

race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Here, Plaintiffs' Title VII

claims - which are based on the same facts underlying their EPA claims - allege only intentional

disparate pay on the basis of sex.[44]  While wage discrimination is forbidden under both Title VII and

the EPA, Title VII is in some respects broader because Plaintiffs are not required to meet the

exacting burden of showing substantial equality of jobs.  *Gunther*, 452 U.S. at 170-71, 181.  At the

same time, however, Plaintiffs have the additional Title VII burden to prove Defendants intended

to discriminate against them on the basis of sex.  *Miranda,*  975 F.2d at 1526.

     Crucial to the court's analysis of Plaintiffs' Title VII claims here is the incorporation of the

EPA affirmative defenses into Title VII by the Bennett Amendment.[45]  *See Gunther*, 452 U.S. at

---

    [44] In other words, as Plaintiffs have readily conceded, there is no disparate impact claim in
this case.

    [45] The Bennett Amendment provides:

    It shall not be an unlawful employment practice under this subchapter for any
    employer to differentiate upon the basis of sex in determining the amount of the
    wages or compensation paid or to be paid to employees of such employer if such
    differentiation is authorized by the provisions of section 206(d) of title 29 [the

170-171.  This incorporation allows employers to defend against charges of discrimination under Title VII where the evidence establishes that their pay differentials are based on a *bona fide* use of "other factors other than sex." *See Corning Glass Works v. Brennan*, 417 U.S. 188, 198-201 (1974). Where, as here, Defendants have established as a matter of law one of the EPA affirmative defenses, that defense is also dispositive of any Title VII claims based upon the same underlying facts.

Therefore, assuming *arguendo* that Plaintiffs could establish a *prima facie* case of intentional discrimination under Title VII, they have not overcome, or shown to be pretextual, the explanation offered by Defendants that factors other than sex are to blame for the pay differential here.  For this reason, Defendants are due summary judgment on Plaintiffs' claims of intentional discrimination under Title VII.

## III.      Conclusion

For the reasons outlined above, the court finds that Defendant VA's Motion for Reconsideration (Doc #186) and Defendant SPD's Motion for Reconsideration (Doc #185) are due to be granted, with the exception of Defendants' contention that they have established the "merit system" affirmative defense. Plaintiffs' Second Motion for Reconsideration (Doc #184) and Defendants' Motion to Amend/Correct Order on Motion to Alter Judgment (Doc #192) are moot. All pending requests to exclude evidence at trial are moot. (*See* Docs. # 146, 153, 168, 169, 170, 171, 172, 173). The court will vacate its earlier rulings on Defendants' Motion for Summary Judgment (Docs. # 120-2, 155) and grant summary judgment in favor of Defendants (Doc. # 72). A separate order dismissing this case will be entered.

---

affirmative defenses to the Equal Pay Act].

42 U.S.C. § 2000e-2(h).

**DONE** and **ORDERED** this <u>27th</u> day of December, 2007.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE